UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PATRICE LONG                           *    CIVIL ACTION NO. 16-5089
                                       *
VERSUS                                 *    SECTION: "I"(1)
                                       *
CAROLYN   W.   COLVIN,   ACTING        *    JUDGE LANCE M. AFRICK
COMMISSIONER   OF   THE   SOCIAL       *
SECURITY ADMINISTRATION                *    MAGISTRATE JUDGE
                                       *    JANIS VAN MEERVELD
*************************************   *

REPORT AND RECOMMENDATION

The plaintiff, Patrice Long, seeks judicial review, pursuant to Section 405(g) of the Social

Security Act (the "Act"), of the final decision of the Commissioner of the Social Security

Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB")

under Title II of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for

summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for

Summary Judgment filed by the plaintiff (Rec. Doc. 15) be DENIED; and the Motion for Summary

Judgment filed by the Commissioner (Rec. Doc. 18) be GRANTED.

**Procedural Background**

Ms. Long applied for DIB on October 30, 2012, asserting a disability onset date of August

20, 2012. She alleged the following illnesses, injuries or conditions: lupus, joint pain, back pain,

muscle pain, depression, diverticulosis, hiatal hernia, asthma, COPD and headaches.    On

February 11, 2013, her claim was denied by the state agency. The Disability Determination

Explanations concluded:

> [t]he medical evidence shows you have experienced pain and discomfort from your
> condition, but it does not cause severe limitations. Although you experienced
> depression, you are still able to perform your usual daily activities. . . . We have
> determined that your condition is not severe enough to keep you from working.

1

Ms. Long requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 2, 2014. Ms. Long was represented by counsel. On July 11, 2014, the ALJ issued an adverse decision. The Appeals Council denied review on September 10, 2015. Ms. Long requested reconsideration or, alternatively, an extension of time to file a civil action. The Appeals Council did not reconsider its decision, but granted an extension of time.

On May 11, 2016, Ms. Long filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 7, 8). The parties filed cross-motions for summary judgment. (Rec. Docs. 15, 18). Ms. Long is represented by counsel.

## Evidence in the Record

Between 1998 and 2012, Ms. Long worked as a senior client service associate for a health insurance company, she performed office work for a construction company, and she was a data and logistics assistant for a research institute. (Rec. Doc. 8-6, at 2). She indicated in her application for benefits that she stopped working on September 20, 2012, because of her condition. Id. at 16.

*Physical Conditions: Lupus and Pain in Back, Fingers, and Hands*

At the hearing, Ms. Long testified that constant pain prevents her from working. R. at 55. She said the worst pain was in her lower back and that it shoots down her legs. R. at 55. This pain started after she had a fall in August 2012. R. at 56. She testified that at the time of her injury, the pain was constant. R. at 56-57. She also said she had upper back pain running into her shoulders and neck. R. at 57. She was unable to describe when the upper back pain started but indicated the pain seemed worse after receiving radiofrequency ablation treatment from Dr. Happel. R. at 57-58. She explained that she has tingling and numbness in her fingers and pain in both wrists, though mainly the right. R. at 48. For example, Ms. Long testified that she has trouble opening jars,

picking up stuff, twisting a doorknob, holding a paintbrush or writing for a long time (after 15-20 minutes) because of pain. R. at 58. She testified that when using the computer she also gets cramping in her wrists and fingers. R. at 59. Ms. Long testified that she must rest for an hour or more before being able to resume what she was doing. R. at 59.

Ms. Long testified that she had been in a car accident a few weeks before the hearing and that she was experiencing increased pain. R. at 59. No records with regards to this accident were provided.

Ms. Long testified that she experiences some pain when holding her hands over her head or when trying to twist a doorknob and push open the door. R. at 60. She said that she could walk less than a block before needing to stop and rest because of the pain in her legs. R. at 61. She said that she could stand for about 20 minutes before needing to sit or lay down. R. at 61. She said she could sit for 20 to 30 minutes before needing to change position. R. at 61. With regards to lifting, Ms. Long testified that she could not lift a gallon of milk without some pain. R. at 61. She said she could not bend, crawl or stoop without pain. R. at 61.

Ms. Long testified that her medication does not help with her pain. R. at 62. However, she testified that the block injection reduced the shooting pain down her legs and the radiofrequency ablation also helped with the pain. R. at 62.

At the hearing, Ms. Long testified that she does some of the cleaning around the house, like washing dishes, but that she avoids mopping, dusting, and vacuuming. R. at 63. She does not do yard work. R. at 63. Ms. Long drives and said that she goes out about twice a week for physical therapy, aqua therapy, and to do her shopping. R. at 63. When shopping, she uses the cart to support herself. R. at 64. She testified that she spends a lot of time in bed because of the pain. R. at 64.

In her Function Report, Ms. Long described her day as follows: She takes a shower, prepares breakfast, cleans the house and takes care of her pets. Id. at 38. Then she rests, has lunch, and rests again. Id. She prepares dinner when her husband comes home, then cleans, rests, takes her medication, and goes to bed. Id. She reported that she could feed herself and use the toilet without problems. She reported some pain with taking laundry out of the washer and dryer and putting on pants and shoes. Id. She reported that she enjoyed riding her bicycle and dancing, but does not ride her bicycle anymore and she does not dance as often as she did before. Id. at 38, 41.

The first medical record with a complaint of back pain was Ms. Long's September 2011 visit with Dr. Alfredo Vichot for a reevaluation of systemic lupus erythematosus ("SLE"). Id. at 178. It was noted that she had some degree of problems with asthma but no problems with her skin. Id. She complained of acid reflux but denied serious joint pains or shortness of breath. Id. It was noted that she takes Plaquenil 200 mg twice a day for lupus and that she admitted great improvement with the use of this medication. Id. She reported that she felt tired most of the time and had low back pain without parethesias in her lower extremities. Id. A physical examination was performed and range of motion of the lumbar spine was found to cause discomfort on flexion and extension and minimal discomfort on lateral flexion, but no radiculopathy. Id. Range of motion of all joints was normal. Id. Dr. Vichot noted the following impression: SLE, fatigue, low back pain, sleep disorder. Id. Yet, he noted that she did not meet the criteria for SLE. Id. He explained that he would continue to consider her SLE in remission and recommended she continue taking Plaquenil and Nexium. Id.

Ms. Long visited Plaquemines Primary Care ("PPC") on September 21, 2011, to establish a primary care practitioner. Id. at 25. Lupus and asthma were noted in her past medical history. Id. Chronic low back pain was also noted. Id. A physical examination was performed and Ms.

Long's lungs were reported clear. Id. at 26. The examiner provided a "stable" impression for SLE, asthma and gastroesophageal reflux disease ("GERD"). Id. Low back pain was also diagnosed. Id.

Ms. Long visited PPC again on October 5, 2011, and reported no new complaints though she reported she still had back pain. Id. Again, SLE, asthma, and GERD were diagnosed stable, and low back pain was also diagnosed. Id. At her October 26, 2011, follow up appointment with PPC, she complained of abdominal pain. Id. at 48. Impressions of SLE and asthma were again stable. Id. Back pain was not mentioned. Id.

A lumbar spine x-ray was taken on October 12, 2011. (Rec. Doc. 8-7, at 35). Dr. Masako Wakabayashi reviewed the results and found the impression within normal limits with disc spaces and the height of vertebral bodies well maintained. Id.

A CT scan of the abdomen and pelvis was performed on October 31, 2011. Id. at 157. An impression of a 7.4 cm cystic lesion with internal septation in the region of the left adnexa was provided. Id.

On November 14, 2011, Ms. Long went to the emergency room with complaints of abdominal pain and lower back pain. Id. at 122. Full range of motion with no pain on movement or palpitation was reported. Id. at 128. Pulses were strong and equal bilateral in the lower extremities. Id. An ultrasound was performed and an impression of a large left ovarian simple cyst was noted. Id. at 134.

On December 8, 2011, Ms. Long visited Dr. Vichot complaining of low back pain. Id. at 176. She denied paresthesias, though complained of some discomfort in the left foot with paresthesias. Id. She also complained of dry eyes and dry mouth and shortness of breath. Id. He noted that Ms. Long had undergone x-rays of the lumbosacral spine and MRIs, which were

negative, although she was still experiencing pain. Id. A physical examination was performed and good range of motion of the cervical spine was noted, as well as normal range of motion of upper extremities, hips, knees, and ankles. Id. There was no alopecia, facial rash, icterus, episcleritis, stomatitis, or parotid enlargement. Id. Dr. Vichot provided the following impression: SLE, low back pain, sleep disorder, paresthsias lower extremity. Id. He recommended Ms. Long continue Plaquenil for SLE and noted that low back pain appeared to be a mechanical problem due to the fact that she was told she had scoliosis. Id. He noted that dry mouth was probably associated with Sjogren's syndrome. Id.

On December 15, 2011, she visited Dr. Rian Tanenbaum at metropolitan Gastroenterology Associates complaining of abdominal pain the right left quadrant. Id. at 76. A colonoscopy was performed on December 20, 2011. Id. at 74. Ms. Long denied anxiety, depression, or memory loss and denied back and muscle pain. Id. at 78. The physical examination reported normal breath sounds with no wheezing. Id. Dr. Tanenbaum further reported that Ms. Long had a normal gait, and normal range of motion with no pain. Id. at 77. He noted no evidence of depression, anxiety, or agitation. Id.

An undated "Office Note" in Ms. Long's medical records from PPC was signed by Dr. Joan Cheng. Id. at 84-86. It refers to the October 31, 2011, CT scan, November 14, 2017 pelvic ultrasound and December 2011 colonoscopy. Id. The note appears to have been prepared prior to a January 2012 surgery to remove the left ovarian mass because Dr. Cheng discussed her recommendation of surgery. Id. Past medical history included a note that Ms. Long's last asthma attack was more than three years ago and that she has never been hospitalized or intubated for asthma. Id. Ms. Long reported some neuropathy in both feet but no other neurological symptoms. Id. at 85.

On January 5, 2012, Ms. Long had a follow up appointment at PPC for abdominal pain. <u>Id.</u> at 79. Impressions of Asthma and SLE were stable. <u>Id.</u> She continued to complain of back pain. The examiner noted the pain might be due to SLE, but also noted a ten year history of spinal stenosis. <u>Id.</u> Further testing was recommended.

On January 17, 2012, Dr. Pui Chun Cheng performed a robotic assisted laproscopic procedure to remove the left ovarian mass. <u>Id.</u> at 5-6. As part of her preoperative preparation, two chest x-rays were performed. <u>Id.</u> at 11. Her lungs were found well aerated and clear. <u>Id.</u>

On January 26, 2012, Ms. Long visited PPC. A successful laparoscopic procedure was reported. <u>Id.</u> at 91. Ms. Long reported that her abdominal and lower back pain had resolved since the surgery. <u>Id.</u> Impressions of SLE, asthma, and GERD were stable. <u>Id.</u>

On March 13, 2012, Ms. Long visited Dr. Vichot complaining of some discomfort when coughing, dry eyes, and dry mouth. <u>Id.</u> at 175. She did not complain of fever, weight loss, Raynaud's, pleuritic pain, paresthesias, swollen glands, or night sweats. <u>Id.</u> Her lungs were clear. <u>Id.</u> Range of motion in upper and lower extremities was normal. <u>Id.</u> She had tenderness on palpation of the costochondral joints over the right and left, but no trigger points or muscle spasm in the trapezius. <u>Id.</u>

On April 5, 2012, Ms. Long visited PPC. <u>Id.</u> at 16. Impressions were that her SLE, asthma, GERD, and her status post pneumonia were stable. <u>Id.</u> at 16. She reported no complaints and that she felt much better. <u>Id.</u>

On April 23, 2012, Ms. Long visited Dr. Vichot for a reevaluation of her SLE. <u>Id.</u> at 173. She complained only of shortness of breath and noted that she had recently been diagnosed with bronchitis. <u>Id.</u> She was negative for rashes, seizures, photosensitivity, Raynaud's, sores in mouth, dry eyes or dry mouth, swollen glands, bleeding, bruises, or joint swelling. <u>Id.</u> He performed a

physical exam and noted good range of motion of all upper and lower extremity joints, and clear lungs with no rales or rubs. <u>Id.</u> He noted an impression of SLE and dyspnea. <u>Id.</u> Dr. Vichot provided the following impression: SLE, xerostomia, sleep disorder, costochondritis.

On July 16, 2012, Ms. Long was again examined by Dr. Vichot for reevaluation of her SLE and sleep disorder. <u>Id.</u> at 170. He noted that "[s]he has been doing fairly well except for her only problem which seems to be her asthma." <u>Id.</u> He noted that she was taking Symbicort, Albuterol, Plaquenil, Flexiril and Prednisone. <u>Id.</u> He provided an impression of SLE and sleep disorder. <u>Id.</u> He performed a physical examination and reported Ms. Long had full range of motion of all upper and lower extremity joints with no evidence of facial rash, episcleritis, synovitis, stomatitis, or joint swelling. <u>Id.</u>

On October 2, 2012, Ms. Long was again examined by Dr. Vichot for a reevaluation of her SLE. <u>Id.</u> at 169. She denied any tremor, nausea, vomiting, black stools, or bone pain, but she "just didn't feel good." <u>Id.</u> Ms Long reported she had fallen backwards the previous month and hit her head but had not lost consciousness. <u>Id.</u> Dr. Vichot reported Ms. Long was negative for flareups of her SLE such as seizures, facial rash, photosensitivity, Raynaud's, chest pains, dyspnea on exertion or parethesias in her hands or feet, joint swelling, frequency of urination, blood in her urine or stools, or black stools. <u>Id.</u> Upon examination, he reported no scalp tenderness, facial rash, alopecia, stomatitis, supraclavicular adrenopathy. <u>Id.</u> Her lungs were clear with no rales or rubs. <u>Id.</u> Her parotids showed no evidence of bruits. <u>Id.</u> He found good range of motion of all joints without synovitis or effusions. <u>Id.</u> He found no abdominal pain, Raynaud's, clubbing or cyanosis. <u>Id.</u> He provided the following impression: SLE, sleep disorder, vitamin D deficiency, adverse reaction to vitamin D. <u>Id.</u>

On October 30, 2012, she visited Dr. Shari Rodgers at Ochsner complaining of leg pain following an incident at home. Id. at 182. She was found negative for cough, chest tightness, and shortness of breath. Id. She was positive for back pain and arthralgias, but negative for tingling or numbness. Id. She was oriented to person, place, and time and appeared well-developed and well-nourished. Id. She was assessed negative for myalgias, joint swelling and gait problem. Id. Her neck had a normal range of motion. Id. Her angles exhibited normal range of motion. Id. She was diagnosed with arthritis. Id. at 183.

Ms. Long had a follow up appointment with Dr. Tanenbaum at Metropolitan Gastroenterology Associates on December 6, 2012. Id. at 186-87. He noted she was well-developed, well-nourished, and in no acute distress. Id. at 187. He noted an impression of abdominal pain, right lower quadrant. Id. Probiotics and weight loss were recommended. Id.

On November 13, 2012, Ms. Long visited Dr. Mark Juneau, Jr., complaining of low back pain for three months that began following a fall at home. Id. at 201. She reported the pain was burning and stabbing and does not radiate. Id. She reported no paresthesias or weakness in the legs. Id. A physical examination was performed and Dr. Juneau reported tenderness to palpation in the lower lumbar spine, full range of motion, and paraspinal muscle strength within normal limits. Id. at 202. A straight leg raise test was negative bilaterally. Id. Dr. Juneau reported full, painless range of motion in the lower extremities bilaterally. Id. at 202-203. Her gait and station were normal. Id. at 203. Dr. Juneau injected Depo-Medrol and lidocaine and provided a Medrol Dosepak. Id. at 204.

An MRI of the lumbar spine was performed on December 14, 2012 and interpreted by radiologist Dr. Michael J. Alline. Id. at 200. L4-L5 and L5-S1 were noted as having a desiccated

disc with posterior annular tear and central disc bulge. Id. Dr. Aline noted the following impression: mild disc degeneration at L5-4 and L5-S1 with no nerve root impingement. Id.

On December 28, 2012, Ms. Long followed up with Dr. Juneau and complained of low back pain and pain in the right and left legs. Id. at 194. She reported no improvement since the last visit. Id. She described the pain as aching and burning and moderate in intensity. Id. They reviewed her MRI which Dr. Juneau described as showing bulging disk, degenerative disk and herniated disk. Id. Ms. Long denied anxiety or depression. Id. On physical examination, Dr. Juneau found tenderness present in her lower lumbar spine and over piriformis area. Id. He found a straight leg raise test positive bilaterally, full range of motion in lumbrosacral spine, and painless range of motion in the hip. Id. at 195-96. He ordered physical therapy. Id. at 197.

Ms. Long attended physical therapy appointments at Rehab Access, Inc., five times in January 2013. Id. at 214-20. At her initial evaluation, functional range of motion tests were performed. Id. Flexion was at 60%, extension was at 10%, left side bend at 50%, right side bend at 40%, left shift at 50% and right shift at 25%. Id. at 219. The side bends and right shift increased pain. Id. Radicular symptoms were noted but no sensation deficits. Id. Gross lower extremity strength was also tested. Id. at 220. On the right side, hip flexion, knee extension, knee flexion, ankle dorsiflexion and great toe extension were all 5. Id. On the left, knee extension and knee flexion were 5, while hip flexion and ankle dorsiflexion were 4, and great toe extension was 4 plus. Id. Her rehab potential was predicted to be fair to good. Id. At most of the following appointments, Ms. Long complained that the drive to physical therapy was increasing her pain. Id. at 216-18. At her fifth visit, the physical therapist Amber Dannenmueller recommended that Ms. Long consider further pain management due to her inability to tolerate the physical therapy. Id. at 215.

On January 22, 2013, Ms. Long visited PPC for a follow up appointment. Id. at 233. SLE, asthma and GERD were assessed stable. Id.

Ms. Long visited Dr. Vichot on January 28, 2013, for reevaluation of her SLE. (Rec. Doc. 8-1, at 58). He noted that her "main problem seems to be her back pain which is giving her a lot of problems. She actually had to decline a job due to her back." Id. Ms. Long reported that she had seen Dr. Juneau "who performed an MRI and shows that she has significant desiccation in the L5-S1 and L4-L5 discs. There is also annular tear and a bulging disc centrally which indents the thecal sac but there is no nerve compression." Id. Dr. Vichot performed a physical examination and concluded she had no alopecia, facial rash, episcleritis, parotid enlargement or submandibular swelling. Id. Her lungs were clear. She had good range of motion in upper extremities but reduced range of motion in the lumbar spine. Id. He indicated that half of the 45-minute consultation involved discussion of her low back issues. Id. at 59. He recommended that she see a neurologist. Id. He also stated that after review of her records, Ms. Long "seems to me like a Sjogren's patient rather than SLE." Id.

Ms. Long also visited Dr. Juneau on January 28, 2013, complaining of low back pain and right leg pain. (Rec. Doc. 8-8, at 42). Ms. Long reported no improvement since her previous visited and stated she wanted to see a neurosurgeon. Id. She denied anxiety or depression. Id. at 43. An epidural steroid injection was ordered. Id. at 45.

Ms. Long visited Dr. Juneau again on March 11, 2013, complaining of low back pain and left leg pain with slight improvement since the last visit. Id. at 38. She denied anxiety or depression. Id. at 39. Hydrocodone-acetaminophen was prescribed. Id. at 41.

Ms. Long returned to Dr. Vichot on March 25, 2013, for reevaluation of SLE. Id. at 57. Impression was SLE and vitamin D deficiency. Id.

Ms. Long visited Dr. Juneau on April 22, 2013, complaining of low back and leg pain with slight improvement since her previous visit. Id. at 34. She denied anxiety, depression, chest pain, rapid heart rate and shortness of breath. Id. at 35. Physical therapy was ordered and hydrocodone-acetaminophen and etodolac were prescribed. Id. at 37.

Ms. Long returned to Dr. Juneau on May 20, 2013, complaining of back pain and bilateral leg pain. Id. at 30. She denied anxiety, depression, chest pain, rapid heart rate, and shortness of breath. Id. at 31. Depo Medrol, Lidocaine, and injections were prescribed. Id. at 33.

Ms. Long visited Dr. Vichot on June 5, 2013 for a follow up. Id. at 44. She reported that she had not been feeling well due to back pain. Id. She reported that cortisone injections and epidurals had not helped. Id.

On June 10, 2013, Ms. Long visited Dr. Juneau complaining of back pain and right leg pain with slight improvement since her previous visit. Id. at 26. She denied anxiety, depression, chest pain, rapid heart rate, and shortness of breath. Id. at 27. Dr. Juneau ordered a consultation with Dr. Steck. Id. at 29.

On July 2, 2013, Ms. Long visited Dr. Lincoln Pranikoff to follow up for lupus. (Rec. Doc. 8-7, at 238). A physical examination was performed. Id. at 239. Dr. Prankikoff noted Ms. Long had moderate lumbar and S1 joint tenderness bilaterally. Id.

On July 18, 2013, new lumbar x-rays were performed and Dr. John Steck examined Ms. Long. Id. at 252-56. In his report to Dr. Vichot, Dr. Steck explained that the "MRI of the lumbar spine is essentially normal other than some mild degeneration at 4-5 and S1. There is no stenosis, no disc herniation or subluxation." Id. at 252. He also reported that "AP lateral standing flexion/extension were all normal with no instabilities." Id. Dr. Steck recommended facet blocks

and possibly facet rhizotomy as well as physical therapy. Id. at 252-53. He concluded there was "nothing surgical" and that over time her pain would resolve. Id. at 253.

Ms. Long returned to visit Dr. Juneau on August 6, 2013, complaining of low back pain with no improvement. (Rec. Doc. 8-8, at 22). She denied anxiety, depression, chest pain, rapid heart rate, and shortness of breath. Id. at 23. On physical examination he noted tenderness present in the lower lumbar spine. Id. at 24. Muscle strength was within normal limits and the straight leg raise test was negative bilaterally. Id. Dr. Juneau ordered physical therapy and a consultation with Dr. Hubbell for possible facet injections and possible stimulator. Id. at 22.

On September 10, 2013, Ms. Long visited Dr. Paul J. Hubbell at Southern Pain and Anesthesia complaining of low back and leg pain. Id. at 102. Ms. Long reported pain at a level of 6 out of 10 and reported that her pain was under poor control. Id. Dr. Hubbell noted muscle spasm and tenderness bilaterally upon inspection and palpitation of the lower back. Id. at 103. Bilateral lower extremities were normal. Id. She was oriented to person place and time and her mood and affect were normal. Id. at 105. Dr. Hubbell instructed Ms. Long to return to the clinic for lumbar medial branch blocks at the L4-L5 and L5-S1 level. Id. at 107.

On September 24, 2013, Dr. Hubbell performed a lumbar facet nerve median branch block at the bilateral L4-5, L5-S1 level. Id. at 128. Ms. Long followed up with Dr. Hubbell's office on October 9, 2013, complaining of lower back pain. Id. at 108. She rated her pain at 8 of 10. Id. at 110. She reported she experienced 85% pain relief on the day of the branch block but that about six to eight hours later her pain began to return. Id. Dr. Hubbell diagnosed lumbrosacral spondylosis without myelopathy, with a secondary diagnosis of degeneration of lumbar or lumbosacral intervertebral disc. Id. He instructed Ms. Long to return to the clinic for lumbar medial branch radiofrequency at the L4-L5, L5-S1 levels. Id.

On October 22, 2013, Dr. Hubbell performed a lumbar radiofrequency ablation of the median branch facet nerve at the bilateral L4-5, L5-S1 levels. Id. at 127. Ms. Long followed up with Dr. Hubbell on November 4, 2013, complaining of pain in the lower back and sacroiliac region. Id. at 111. Ms. Long reported a 60% improvement and ongoing pain relief as a result of the lumbar medial branch radiofrequency L4-5, L5-S1. Id. at 112. Dr. Hubbel diagnosed sacroilitis and a secondary diagnosis of lumbosacral spondylosis without myelopathy. Id. at 114.

On November 19, 2013, Dr. Hubbel performed a sacroiliac joint injection with arthrogram. Id. at 126. Ms. Long went to the emergency room later that day, complaining of a headache following a steroid injection. Id. at 69. She was put on IV fluids and provided symptomatic treatment. Id. at 72. She was discharged with hydrocodone, Phenergan and Benadryl. Id. No diagnosis was made. Id.

Ms. Long returned to Dr. Pranikoff on December 3, 2013, at PPC, for a routine evaluation. Id. at 84. He noted she was stable and had a partial response to lumbar epidural injections. Id. at 85. He recommended continuation of this treatment. Id.

Ms. Long visited Dr. Hubbell on December 13, 2013, complaining of pain in the sacroiliac region as well as pain in the posterior neck on bilateral sides and the hands. Id. at 116. She also noted headaches. Id. She rated her pain as 5 of 10 and reported that her pain was under fair control. Id. at 117. She reported 50% improvement and ongoing pain relief as a result of a sacroiliac joint injection on November 19, 2013. Id. She reported no side effects. Id. at 119. Dr. Hubbell diagnosed brachial neuritis or radiculitis NOS with a second diagnosis of carpal tunnel syndrome. Id. at 119. She was instructed to use NSAID gel to wrists and use wrist splints at night and ice. Id.

Ms. Long visited Dr. Vichot for reevaluation of her SLE on December 18, 2013. Id. at 101. He noted no "flares" and her only complaints were dry eyes and dry mouth as well as low

back pain. Id.  On physical examination he reported clear lungs, normal heart sounds, no facial rash or alopecia, and good range of motion in upper and lower extremities without Raynaud's clubbing or cyanosis. Id.  Dr. Vichot again noted that he believes Ms. Long has Sjogren's and not SLE. Id.

An MRI of the cervical spine was performed on December 23, 2013. Id.  at 91. The radiologist found mild disc degeneration and loss of disc height a C3-C4, C4-C5 and C5-C6. Id. Impression included no large disc protrusion and no significant central canal or neuroforaminal stenosis. Id.

Ms. Long visited Dr. Ikechukwu Obih on December 26, 2013, for an EMG/Nerve conduction study. Id. at 92, 134). Ms. Long complained of tingling in her wrists and finger tips bilaterally as well as headache and neck pain. Id. at 92. Dr. Obih performed a physical exam and found strength of 5/5 in bilateral upper extremities; decreased light touch in the right first two and a half digits and left fifth digit. Id.  Sensory studies were performed and Dr.Obih reported they showed "mildly increased peak latencies in the bilateral median and ulnar nerves." Id.  Conduction velocities and SNAPS were normal. Id.  Dr. Obih noted the findings were "consistent with a right C8 radiculopathy and possible early beginnings of carpal tunnel syndrome bilaterally." Id. at 93. Further, "her distal latencies for median nerves are borderline normal." Id.  An MRI of the cervical spine was recommended. Id.

Ms. Long followed up with Dr. Hubbell on January 21, 2014, complaining of pain in the lower back and posterior neck. Id. at 121. She also noted headaches, right upper extremity pain and lower extremity pain. Id.  She reported her pain was under fair control. Id.  Ms. Long reported that she had not been able to tolerate physical therapy after three visits, and Dr. Hubbell discussed attempting aquatic physical therapy. Id. 124. Dr. Hubbell diagnosed radiculitis, thoracic or lumbar,

and a second diagnosis of brachial neuritis or radiculitis NOS. Id.  Dr. Hubbell noted that Ms. Long wished to pursue aquatic therapy before additional injections. Id.  Although it does not appear that Ms. Long reported hand or wrist pain on this visit, Dr. Hubbell encouraged Ms. Long to buy wrist splints to wear at night and apply anti-inflammatory gel. Id.

On March 21, 2014, Ms. Long visited Dr. Michael Happel for low back pain, neck pain and brachial radiculitis. Id. at 139. He prescribed a Medrol dosepack and recommended she keep her appointment for aquatic physical therapy. Id.

*Asthma*

At the hearing, Ms. Long said she had not been admitted to the hospital for asthma in the past year. R. at 65. She said that sometimes she has trouble breathing as a result of allergies or if she is around dust, smoke, or strong odors. R. at 65.

Ms. Long visited PPC on February 28, 2012, complaining of sinus congestion. (Rec. Doc. 8-7 at 99). An impression of acute bronchitis/sinusitis was noted. Id.  at 101. She returned for a follow up visit on March 20, 2012, and reported feeling much better. Id.  at 104. An impression of pneumonia was noted. Id.  As noted above, in her April 2012 visit to PPC, the pneumonia was stable. Id.  at 16.

On April 26, 2012, Ms. Long visited pulmonologist Dr. Michel LeBrun complaining of moderate, episodic difficulty breathing, wheezing, and a dry cough. (Rec. Doc. 8-8, at 115-17. He noted bilateral rhonchi present in her breath sounds. Id.  He noted normal range of motion. Id.  The following were noted on the "problem list": shortness of breath, lupus, hiatal hernia, chest pains or pressure, asthma, acid reflux. Id.  Dr. LeBrun diagnosed Ms. Long with asthma, cough, and dyspnea and noted that she had been taking Symbicort and albuterol. Id.  He added a prescription for Singulair. Id.

On June 22, 2012, Ms. Long followed up with Dr. LeBrun with complaints of coughing and a heavy feeling in the upper chest. Id. at 113-14. He noted her breath sounds had bilateral rhonchi. Id. He reported pulmonology results of oxygen saturation at 99%. Id. He diagnosed asthma, bronchitis, cough, and dyspnea. Id. The following were again noted on the "problem list": shortness of breath, lupus, hiatal hernia, chest pains or pressure, asthma, acid reflux. Id. A CT scan was ordered. Id.

A CT scan of Mr. Long's thorax was performed on July 17, 2012 and interpreted by radiologist Dr. John Mark Vitter. Id. at 112. Dr. Vitter provided the following impression: multiple tiny subpleural nodules, likely incidental but follow up recommended; very mild reticular lung changes probably representing residual from prior inflammatory disease; very small bulla noted at the left apex; very small hiatal hernia; circumscribed low density nodular region within the anterior segment right lobe of the liver may be an incidental cyst that is not fully evaluated by this exam, and follow-up ultrasound of the liver recommended. Id.

On July 26, 2012, pulmonologist Dr. LeBrun performed another examination. Id. at 109-11. Ms. Long's lungs were clear and her respirations were non-labored. Id. She had a normal range of motion. Id. The following were again noted on the "problem list": shortness of breath, lupus, hiatal hernia, chest pains or pressure, asthma, acid reflux. Id. Dr. LeBrun diagnosed asthma and concluded that Ms. Long had improved and should continue with current regimen of Singulair and prednisone. Id.

On January 23, 2013, Dr. LeBrun added a note to Ms. Long's file stating that Ms. Long had moderately severe asthma, had last been seen six months prior, and had been doing well since. Id. at 235. He noted that her symptoms appeared to be under control with a therapy of Singulair, Symbicort, and Ventolin. Id.

As noted above, Ms. Long's asthma was diagnosed stable in her visits to PPC on September 21, 2011; October 5, 2011; January 5, 2012; January 26, 2012; April 5, 2012 and January 22, 2013. As noted above, Ms. Long reported to Dr. Cheng in January 2013 indicate the last asthma attack she had suffered was over three years prior. She denied shortness of breath in her visits with Dr. Juneau on April 22, 2013; May 20, 2013; June 10, 2013; and August 5, 2013.

*Mental Conditions and Social Functioning*

In her Function Report, Ms. Long reported that she visits with a close friend once a week and talks to family and friends on the phone and by computer. (Rec. Doc 8-6, at 41). She reported that while working for Blue Cross Blue Shield she learned to deal with a high level of stress, but it is harder for her now. Id. at 43. Ms. Long reported that she gets along well with authority figures. Id. She reported that she can follow written and spoken instructions though she writes things down to remember. Id. at 42. She reported that she could pay attention for hours. Id. She reported that she had been treated for depression over ten years ago and that she was not currently being treated for depression. Id. at 44. The only side effect from medication that she noted was feeling sleepy from taking Flexeril. Id.

Ms. Long's husband also filled out a Function Report for Ms. Long. Id. at 46. He noted that fatigue could interfere with her concentration and memory. Id. at 51. He reported that she handles stress and changes in routine very well and gets along very well with authority figures. Id. at 52. He reported that she can follow written instructions fairly well and spoken instructions "ok." Id. at 51. He reported that she can pay attention for several hours if not fatigued. Id. Except for the reference to fatigue interfering with concentration and memory, Mr. Long did not report any mental conditions affecting Ms. Long's ability to function.

While the state agency was reviewing Ms. Long's application, SDM Shenita Bates communicated with Ms. Long regarding her medical records. Ms. Long confirmed that she has not been attending a mental health clinic. (Rec. Doc. 8-3, at 8). Ms. Long reported to Ms. Bates that she takes care of pets, cooks, does house work, drives, shops, visits with close friends or talks to family on the phone or computer. Id. at 9. She said she had problems with memory and did not handle stress, but could handle changes in routine "ok." Id.

A psychological evaluation was performed by Christine B. Powanda, Ph.D., on January 9, 2013. (Rec. Doc. 8-7, at 208). Dr. Powanda noted that Ms. Long presented with a depressed mood and reported significant symptoms of anxiety and depression. Id. at 212. Ms. Long "reported irritability and self-esteem issues that may likely negatively impact interpersonal relationships in a job situation." Id. Dr. Powanda further reported that Ms. Long was able to follow simple verbal direction during the test performed in a low distraction environment, but she noted that "due to mental health symptoms and reported adverse medicine effects, she may have difficulty maintaining appropriate sustained attention for more prolonged periods, such as on the job." Id. Dr. Powanda observed that Ms. Long evidenced "overall adequate sustained attention" with "some difficulties with memory and mental control." Id. at 210. Dr. Powanda also observed that Ms. Long responded at a normal pace and her persistence and effort were good. Id. Dr. Powanda noted that Ms. Long "reported difficulty coping with current life stressors." Id. at 212. Dr. Powanda listed Axis I diagnostic impressions of Anxiety Disorder, NOS, and Depression, NOS. Id. She concluded that Ms. Long's "mental health seems fair overall." Id.

When Ms. Long visited Dr. Pranikoff on July 2, 2013, to follow up for lupus, a depression screening was conducted and Ms. Long's responses were interpreted as moderately severe

depression. Id.  Ms. Long stated she was more depressed now because of her back pain and that she had started seeing a psychiatrist. Id.

There are no other medical records indicating any type of mental condition. Indeed, as noted in the physical condition section above, Ms. Long denied anxiety or depression on December 15, 2011, in her visit with Dr. Tanenbaum. She also denied anxiety or depression in her visits with Dr. Juneau on December 28, 2012; January 23, 2013, March 11, 2013; April 22, 2013; May 20, 2013; June 10, 2013; and August 6, 2013.

At the hearing, when asked to describe what she meant by feeling "depressed," Ms. Long described herself as sad and disappointed with herself for not being able to do the things she used to do. R. at 66. When asked about complications resulting from her medication, Ms. Long noted acid reflux and fatigue. R. at 66.

*Vocational Expert Testimony*

The ALJ asked the vocational expert to consider a person limited to sedentary work in which she could lift a maximum of ten pounds. She could walk and stand for 2 hours out of an 8-hour work day in increments of 20 to 30 minutes at a time, and she could sit six or more hours out of an 8 hour work day. She would need to alternate positions when standing or walking. She could stoop occasionally. She can grasp, turn and hold and she can use her fingers for precise work. As a result of difficulty maintaining attention and concentration and completing tasks, she is limited to jobs utilizing short-term memory and understanding, remembering, and carrying out simple instructions. The vocational expert testified that such a person could not perform Ms. Long's past work. The ALJ asked whether there would be jobs available for a "younger" individual with such limitations and with a high school education who can read, write, add and subtract. R. at 69. The vocational expert testified that jobs would be available and provided receptionist and information

clerk as examples and listed DOT number 237.367-046. Id. There would be 1,250 such jobs available in Louisiana and 87,000 nationally. Id. The vocational expert also provided general office clerk as an example and listed DOT number 249.587-018. Id. There would be 1,270 of such jobs available in Louisiana and 100,000 nationally. Id. The vocational expert testified that such jobs would also be available if the person could not work around dust, fumes and gases. Id.

Ms. Long's attorney asked whether there would be jobs available if the person were also limited in bilateral manual dexterity to occasional use of the hands. Id. The vocational expert testified that limiting bilateral hand use to 1/3 of the time would reduce, but not eliminate the jobs available. R. at 70. The vocational expert said the reduction would be approximately 25% for the receptionist and information clerk position and approximately 50% for general office clerks. Id. The vocational expert testified that if the person had to miss work two or more days a month on a regular basis she would not be able to maintain employment. Id.

## Decision of the Administrative Law Judge

The ALJ determined that Ms. Long meets the insured status requirements of the Act through December 31, 2016. The ALJ found that Ms. Long has not engaged in substantial gainful activity since September 20, 2012,[1] the alleged onset date. The ALJ found that Ms. Long has the following severe impairments: disorders of the back (discogenic and degenerative) and systemic lupus erythematosus. However, the ALJ considered the listings 1.04 (spine disorders) and 14.02 (systemic lupus erythematosus) and found that Ms. Long does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed

---

[1] The record is not entirely clear on the alleged onset date. In her brief, Ms. Long asserts an onset date of August 20, 2012, which is also the date referred to in the Disability Determination Explanation. The Application Summary for Disability Benefits, however, refers to September 20, 2012, as the alleged onset date. No party has raised this discrepancy as an error for review and the Court finds no basis to interpret it as an error.

impairments on 20 CFR Part 404, Subpart P, Appendix 1. The ALJ found that Ms. Long has the residual functional capacity ("RFC") to perform sedentary work, with the following limitations:

> She can lift/carry 10 lbs maximum; stand/walk 2 hours in an 8-hour workday in increments of 20/30 minutes with alternating positions. She can sit 6 hours in an 8-hour workday. She can occasionally stoop. She can grasp, and use fingers for precise work. Due to pain and other factors, she would have limitations with maintaining attention and concentration SUCH THAT she would be able to function satisfactorily only in jobs utilizing short-term memory and in which she would be required to understand, remember, and carry out simple instructions. She should also avoid exposure to dust/fumes/gas.

The ALJ concluded that Ms. Long was unable to perform any past relevant work. The ALJ determined that she was a "younger individual" on the alleged disability onset date because she was born on November 11, 1967, and she was 44 on the alleged disability onset date. The ALJ determined that Ms. Long has at least a high school education, is able to communicate in English, and has acquired work skills from past relevant work. The ALJ concluded that considering Ms. Long's age, education, work experience, and RFC, the work skills acquired by Ms. Long from past relevant work are transferable to other occupations with jobs in significant numbers in the national economy. Thus, the ALJ held that Ms. Long has not been under a disability under the Act from September 20, 2012, through the date of the decision.

## Statement of Issues on Appeal

Issue No. 1.    Whether the Commissioner Failed to Properly and Adequately Consider Whether the Plaintiff's Depression, Migraines, and Asthma were Severe Impairments

Issue No. 2.    Whether the Commissioner Erred by Failing to Apply the Proper Legal Standard to Determine Plaintiff's Credibility Regarding Pain and Other Symptoms

Issue No. 3    Whether the Commissioner Failed to Apply the Correct Legal Standard when Assessing the Plaintiff's Residual Functional Capacity and that Finding is Not Supported by Substantial Evidence

## Analysis

## I. **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II. **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to

the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. <u>See</u> 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. <u>Id.</u> Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

<u>Perez</u>, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." <u>Id.</u> Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. <u>Id.</u> An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. <u>Id.</u>

## I.    <u>**Plaintiff's Appeal**</u>.

Issue No. 1.    Whether the ALJ Failed to Properly and Adequately Consider Whether the Plaintiff's Depression, Migraines, and Asthma were Severe Impairments

Ms. Long complains that the ALJ erred in failing to determine that her depression, migraines[2] and asthma are severe impairments. She points out that the ALJ incorporated environmental limitations related to asthma in his RFC assessment, but failed to find her asthma

---

[2] Ms. Long does not point to any evidence of migraines in this section of her argument. Ms. Long went to the emergency room complaining of a headache following a steroid injection in November 2013. Ms. Long also complained of headaches to Dr. Hubbell in November 2013 and January 2014, but there do not appear to be any diagnoses related to headaches, much less migraines.

was severe. She argues that the medical records support a finding that asthma was severe. She also argues that Dr. Powanda's consultative mental examination was mischaracterized by the ALJ and that Dr. Powanda's report along with the depression screening conducted at PPC should have resulted in a finding that Ms. Long's depression is a severe impairment.

The Commissioner points out that a purported omission by the ALJ at step two is not a true claim of error if the ALJ's analysis proceeds beyond step 2. Compare Jones v. Bowen, 829 F.2d 524, 527 n. 1 (5th Cir. 1987) (rejecting the claimant's challenge to the ALJ's severity finding at step 2 because the ALJ had proceeded through the full sequential evaluation process) and Chaparro v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) (rejecting the claimant's argument that the ALJ had employed the wrong standard to assess whether his impairment was severe because the ALJ proceeded through the full analysis and ultimately determined that the claimant could return to his past relevant work) with Stone v. Heckler, 752 F.2d 1099, 1106 (5th Cir. 1985) (reversing the ALJ's decision where the incorrect "severity" standard was applied at step 2 and the ALJ denied the claim on the basis that the claimant had no severe impairment). The Court agrees. The ALJ did not deny Ms. Long's claim on the basis that she had no severe impairments. The ALJ determined that despite Ms. Long's impairments she has the RFC to perform work that is available in sufficient numbers in the national economy. Even if the ALJ had determined that Ms. Long's asthma and depression were severe, there is no reason to believe that this would have changed the ALJ's assessment of Ms. Long's RFC.[3] Accordingly, the purported error in assessing the severity of Ms. Long's asthma and depression at Step 2 cannot justify reversal.

Moreover, the ALJ's determination that Ms. Long's asthma and depression were not severe is supported by substantial evidence. With regards to asthma, Ms. Long's treating pulmonologist

---

[3] The Court addresses Ms. Long's challenge to the ALJ's RFC assessment in Issue 3 below.

Dr. LeBrun concluded that her asthma symptoms were under control with medical therapy. Ms. Long's primary care practitioner at PPC diagnosed her asthma as stable throughout 2011, 2012, and 2013. There is no record of any recent hospitalization or other issues related to asthma. The ALJ's conclusion that Ms. Long's asthma was not severe and that a limitation against exposure to dust, fumes, and gas was sufficient to address her asthma is supported by substantial evidence.

The ALJ's conclusion that Ms. Long's depression was not severe is also supported by substantial evidence. As with her asthma, the ALJ considered the evidence of Ms. Long's mental conditions and incorporated a limitation to work requiring only understanding, remembering, and carrying out simple instructions into her RFC. The Court rejects Ms. Long's claim that the ALJ mischaracterized Dr. Powanda's report. Although Dr. Powanda determined that Ms. Long "may have difficulty maintaining appropriate sustained attention for more prolonged periods" and that Ms. Long's "reported irritability and self-esteem issues . . . may likely negatively impact interpersonal relationships in a job situation," Dr. Powanda also concluded that Ms. Long's "mental health seems fair overall." Dr. Powanda further found overall adequate sustained attention, normal pace, and good persistence and effort. Although the depression screening conducted in July 2013 by Dr. Pranikoff, a primary care practitioner with PPC, indicated moderately severe depression, as the Commissioner points out, this screening was based on Ms. Long's subjective complaints and not on objective testing. See Greenspan v. Shalala, 38 F.3d 232, 237–38 (5th Cir. 1994) (discounting a physician's treatment notes where evidence of claimant's complaints was "by history"). Moreover, Ms. Long consistently denied depression or anxiety in her visits with Dr. Tanenbaum and Dr. Juneau (including in June and August 2013). Both she and her husband reported that she is able to get along with authority figures and others, that she is able to follow instructions and that she can pay attention for hours. Ms. Long's testimony at the hearing that she

feels sad and disappointed for not being able to do things she used to do does not indicate severe and disabling symptoms. There is no evidence of mental health treatment at any time during the relevant period. Accordingly, the ALJ's determination that Ms. Long's depression is not severe is supported by substantial evidence.

Issue No. 2.    Whether the ALJ Erred by Failing to Apply the Proper Legal Standard to Determine Plaintiff's Credibility Regarding Pain and Other Symptoms

Ms. Long next challenges the ALJ's determination of Ms. Long's credibility regarding her symptoms of depression, hand and finger pain, and back pain. She submits that the ALJ must consider the entire case record in assessing whether her symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. While Ms. Long is correct that the ALJ must review the entire record, the Court finds that the ALJ met his burden to do so.

As discussed above, the ALJ's conclusion regarding the severity of Ms. Long's depression is supported by substantial evidence. The ALJ properly assessed Ms. Long's complaints of depression, which are mixed at best. Ms. Long points to Dr. Powanda's determination that Ms. Long "***may*** have difficulty maintaining appropriate sustained attention for more prolonged periods" and that Ms. Long "reported irritability and self-esteem issues that ***may*** likely negatively impact interpersonal relationships in a job situation." (Rec. Doc. 8-3, at 212) (emphasis added). By the use of the word "may," Dr. Powanda indicated possible effects. Dr. Powanda also concluded that Ms. Long's "mental health seems fair overall" and found overall adequate sustained attention, normal pace, and good persistence and effort. Further, Ms. Long denied depression or anxiety to Dr. Juneau and Dr. Tannenbaum. Ms. Long did not seek treatment for depression or anxiety. Ms. Long's own testimony and the functional reports prepared by her and her husband do

not reflect any disabling effects of depression. It was within the ALJ's discretion to resolve these subjective complaints of depression. The ALJ's conclusion that Ms. Long's depression is not disabling is supported by substantial evidence.

The ALJ's conclusions regarding Ms. Long's hand and back pain are also supported by substantial evidence. "Pain constitutes a disabling condition when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994). It is within the discretion of the ALJ to determine the disabling nature of the claimant's subjective complaints of pain. Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991). The ALJ's determination is "entitled to considerable deference." Id. Importantly, "[s]ubjective complaints of pain must also be corroborated by objective medical evidence." Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001).

Ms. Long testified that she experiences numbness and tingling in her fingers and pain in her wrists. She also stated she has trouble opening jars, holding a paintbrush, and using the computer. The only objective evidence regarding these complaints is in the EMG/Nerve conduction study by Dr. Obih, who concluded that the findings were "consistent with a right C8 radiculopathy and possible early beginnings of carpal tunnel syndrome bilaterally." The ALJ considered Dr. Obih's reported and highlighted the conclusion of "possible early beginnings" of carpal tunnel syndrome, as well as the normal SNAPs and conduction velocities, and only mildly increased peak latencies in the bilateral median and ulnar nerves. As the Commissioner points out, when her pain management physician Dr. Hubbell referred Ms. Long to Dr.Obih, the recommended treatment for her hand pain was use of NSAID gel to the wrists and wrist splints at night with ice. No restrictions were imposed. The ALJ was within his discretion to assess the disabling nature of Ms. Long's complaints and the ALJ's conclusion that her complaints of

manipulative limitations were not as severe as alleged is reasonable and supported by substantial evidence. This Court cannot reweigh the evidence. See Newton, 209 F.3d at 452.

With regard to the ALJ's assessment of Ms. Long's complaints of back pain, Ms. Long argues that the ALJ improperly relied on the conclusion of neurologist Dr. Steck who determined there was nothing surgical here and that over time Ms. Long's pain would resolve. Other than it being a one-time evaluation, Ms. Long cites no reason Dr. Steck's analysis should be discounted. The Court notes that the most recent lumbar MRIs in Ms. Long's medical record are those analyzed by Dr. Steck. He found the lumbar MRI "essentially normal other than some mild degeneration at 4-5 and S1. There is no stenosis, no disc herniation or subluxation." Moreover, the ALJ's determination of the disabling nature of Ms. Long's alleged back pain is not based solely on the conclusion of Dr. Steck. Instead, the ALJ also noted that Ms. Long reported block injections were helpful in relieving her pain, which coincided with Dr. Pranikoff's note indicating a partial response to lumbar epidural injections. The ALJ's assessment of Ms. Long's RFC includes limitations related to her back pain such as the limitation to sedentary work with the requirement of alternating positions in increments of 20/30 minutes, and standing/walking for a maximum of 2 hours in a work day. The ALJ's assessment of Ms. Long's complaints of back pain is reasonable and supported by substantial evidence.

Issue No. 3    Whether the ALJ Failed to Apply the Correct Legal Standard when Assessing the Plaintiff's Residual Functional Capacity and that Finding is Not Supported by Substantial Evidence

Ms. Long complains that the ALJ did not incorporate all of her symptoms into the RFC. First, she says the ALJ failed to include a limitation to address Ms. Long's "consistent reports" that she requires breaks during the day and that pain worsens with prolonged sitting and walking. She argues that her testimony is consistent with her clinical treatment, the failure of conservative

treatment, and the need for ongoing pain management and aquatic therapy. The Court takes note that, as Ms. Long points out, her records indicate that she discontinued physical therapy in January 2013 due to an inability to tolerate it. However, Ms. Long's description of Dr. Juneau's notes are not quite correct. As the Commissioner points out, Dr. Juneau did not conclude that the MRI of her lumbar spine showed "significant desiccation at L4-5 and L5-S1." Dr. Alline, who interpreted the December 2012 MRI noted a desiccated disc with posterior annular tear and central disc bulge. Dr. Alline's impression was mild disc degeneration at L5-4 and L5-S1 with no nerve root impingement. Ms. Long then followed up with Dr. Juneau who noted the MRI showed a bulging disk, degenerative disk, and herniated disk. Neither of these physicians described the desiccation as "severe." Dr. Vichot's report from Ms. Long's January 28, 2013, visit indicates that the MRI "shows that she has significant desiccation in the L5-S1 and L4-L5 discs." However, it appears this was Ms. Long's report to Dr. Vichot and not Dr. Vichot's analysis of the MRI. Further, as noted above, the most recent lumbar MRIs in Ms. Long's medical record are those analyzed by Dr. Steck in July 2013 when he found the lumbar MRI "essentially normal other than some mild degeneration at 4-5 and S1" with "no stenosis, no disc herniation or subluxation."

Ms. Long points out her complaint of pain at a level of 8 of 10 on October 9, 2013 to Dr. Hubbell following the median branch block (which she says the ALJ ignored). But Ms. Long herself fails to note that she reported to Dr. Hubbell on November 4, 2013, and December 13, 2013, that she had experienced improvement of 60% and 50% respectively. While there may be evidence that could support Ms. Long's position that additional limitations should have been included in the RFC, the possibility of an alternate interpretation of the evidence is not sufficient to reverse the ALJ. The ALJ's RFC assessment imposing limitations on lifting, standing, walking

and sitting and requiring alternating positions every 20/30 minutes is supported by substantial evidence.

Ms. Long also argues that Dr. Powanda opined that Ms. Long's depression and side effects of pain medication would affect attention and concentration as well as social interaction and that limitations should have been included in the RFC to address this. The RFC includes a limitation that due to pain and other factors that Ms. Long be limited to jobs in which she should be required to understand, remember, and carry out only simple instructions. As the Commissioner points out, Dr. Powanda's report concluded that Ms. Long "may" have problems with sustained attention and interpersonal relationships. Further, as the Commissioner notes, Dr. Powanda observed that Ms. Long demonstrated adequate sustained attention and responded at a normal pace. And as described by the Court above, Ms. Long and her husband both reported in the Function Reports that Ms. Long could get along well with authority figures and pay attention for several hours. The only side effect from medication noted by Ms. Long was feeling sleepy. The ALJ weighed the evidence and incorporated reasonable limitations into the RFC. His conclusion is supported by substantial evidence.

Ms. Long further argues that the RFC should have included manipulative limitations based on Dr. Obih's findings regarding right C8 radiculopathy and Ms. Long's testimony. The ALJ considered this evidence along with the rest of Dr. Obih's report. The ALJ highlighted that Dr. Obih's clinical finding noted "possible early beginnings" of carpal tunnel syndrome and that the EMG revealed only mildly increased peak latencies in the bilateral median and ulnar nerves. The ALJ's conclusion that further limitations were not necessary in the RFC is supported by substantial evidence.

Ms. Long's argument that the ALJ failed to follow the requirement of SSR 96-8p requiring the ALJ to consider all evidence in the record in determining the RFC must be rejected. Had the ALJ considered only the evidence highlighted by Ms. Long and not all of the evidence in the record, the ALJ might have found support for the conclusions proposed by Ms. Long. However, as described above, the ALJ considered the evidence highlighted by Ms. Long along with the other evidence in the record in determining the RFC. The ALJ's RFC is supported by substantial evidence.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 15) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 18) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 25th day of May, 2017.

_____
Janis van Meerveld
United States Magistrate Judge